Appellant, Mr. Nesbitt for the Appellant, Mr. Shonkor for the Appellee. Good morning. Good morning. May it please the Court, Court Appointing Counsel for Mr. Mohammed with me at counsel's table is Peter Spivak. There is a reasonable probability that Mr. Mohammed was convicted in this case of both offenses because trial counsel failed to pick up the telephone and call potential witnesses using numbers he admittedly received in discovery. And what would those witnesses have testified to? Those witnesses would have testified about the credibility of Jawid, the character at the center of the government's investigation and sting operation against Mr. Mohammed, and they would have provided evidence that Mr. Mohammed was not a member of the Taliban, which went to one of the central elements of the narco-terrorism charge. As to the first, was there no evidence before the jury of the relationship between the two parties? That's, I believe that's right, Your Honor. And that's a fact of which Mr. Venegas, Mr. Mohammed's trial counsel, was aware, in addition to other information that should have led him to pick up that telephone, call potential witnesses. I don't know if you understood my question. I just want to be clear that you did. At trial, was there any evidence or testimony about the relationship between the defendant and the government's key witness? I don't believe there was, Your Honor, no. It was trial counsel's failure to pick up the telephone, contact witnesses that infected the integrity of the entire proceeding. So the jury knew that the two men knew each other, and that they had this conversation? I don't believe it came out at trial that the two men knew each other. Well, they met each other and had a conversation. Well, I mean, knew each other prior to their interactions that were memorialized on those audio tapes. They were played extensively for the jury over the course of two days. So that's certainly true. But I'm referring to these two individuals' extensive past history. No, I just want to know what the jury knew, that's all. Yes. I think what the jury knew was limited to what they heard on those audio tapes. There was nothing at cross-examination of Joweed that brought out any of the past? Mr. Venegas' cross of Joweed was limited to impeachment based upon the money he received from the DEA. He received $8,000. So that shows that credibility was on trial counsel's mind, and yet he never considered, and he admitted he never considered, the prospect of Joweed being biased against Mr. Muhammad. That's at 542, 553, and 709 in the record. He had good reason to think about it. So the jury heard that these two men had a conversation, and that Mr. Joweed decided to turn state's evidence? They knew that, Your Honor. And Joweed testified, and was in fact the only person to testify about the alleged conversation that he had with the alleged Taliban operator in Pakistan, after which he went back to Afghanistan and got Mr. Muhammad involved in what ultimately became the sting operation against him. And the jury never heard from any other source about that piece of the evidence, which was crucial to the government's case. I understand your point about the jury could have heard other things. I'm just trying to focus on what the jury actually heard, both in terms of evidence, and I haven't asked you yet about arguments of counsel. But they knew that Joweed was a government witness who decided to testify in a manner that would adversely affect the defendant. And is that all they knew? You're right that they knew that, Your Honor, and that's what they learned. Is that all they knew? About Joweed's back? Yes. The answer to that is yes. I mean, there wasn't anything drawn out about the relationship between Mr. Muhammad and Mr. Joweed. Is that responsive to Your Honor's question? Yeah, I'll see what the government says. I don't want to focus too much on the unreasonableness of Mr. Gonnegas' decision not to call those he knew that Joweed was the central witness that bread and buttered the case, in his own words, of the government's case. It was that the evidence was not just presented to the jury through Joweed over the course of two days, but Joweed was also the person who collected the evidence against Mr. Muhammad and was, as I mentioned, the only linkage between the alleged Taliban operator in Pakistan and Mr. Muhammad. And my questions really responded to your opening statement, which was focusing on why the person you represent was denied a Sixth Amendment right, and part of that denial was he suffered prejudice that would have affected the outcome of the trial. And I'm trying to track that down. Yes. Your Honor, with respect to the prejudice point, the key point is that because Mr. Gonnegas did not conduct that initial investigation, he didn't uncover crucial impeachment evidence that he could utilize to undermine Joweed's credibility. And that's why I asked you, what would those witnesses have testified to? In other words, counsel has a situation where the government has a tape that is extraordinarily incriminating. And from what you're telling me, they knew nothing about the government's key witness other than what was on the tape and the fact that the witness had turned state's evidence. That's right. It may have come out on direct of Joweed that he knew Mr. Muhammad because they grew up in the same village. That might have come out on direct. Did it or didn't it? I asked you, what did the jury know? I believe, Your Honor, that that piece came out. But the animosity that Joweed bore against Mr. Muhammad, that never came out. And with respect to what these witnesses would have said that would have changed the outcome of trial, I think the most crucial piece of evidence that would have come out was the vow of revenge that one witness would have testified to having personally overheard Joweed make against Mr. Muhammad to the effect of, I will not leave you alone, even if it takes 20 years. And what's the name of that witness? That's a Mr. Malek Reswan, and I'm referring to 514 of the record. Now, that evidence would have been admissible as extrinsic evidence to prove bias, which this court has observed is always admissible. And in particular, a case that's salient here is the case of the United States against Wynn, in which the court observed the previous quarrel between the witness and the party testified against readily suggests the possibility of residual hostility and the admissibility of extrinsic testimony to establish the event seems unquestioned. That's precisely what, that's the character of the evidence that could have been elicited at trial had Mr. Venegas picked up the telephone and uncovered it. Mr. Nesbitt, you talk here today and in your briefing about the mere need to pick up the telephone, but in order for any testimony to be, to assist Mr. Muhammad, it would have to be introduced at trial. What's your contemplation of how any potential testimony that a public counsel identified might have been reduced to admissible evidence for this trial? Mr. Venegas could have procured declarations and affidavits from those individuals. Could those have been introduced at trial? Declarations? If he was unable to get dispensation from the district court to physically bring the witnesses from Afghanistan that he could have located telephonically, then he could have issued letters of rogatory or submitted written testimony from these individuals. Those individuals would have had to voluntarily come under that scenario. That's true. They would have had to come voluntarily. So the proffer is that there are witnesses who would have traveled to the United States voluntarily and testified in Mr. Muhammad's defense in federal court. Yes. And these are witnesses for whom we don't actually have declarations in the record at this point. We just have counsel's declaration explaining the investigation that a public counsel did, Mr. Desai. That's correct. If Mr. Venegas had known about that evidence, he could have made that argument to the trial court and received on that basis a continuance to bring those witnesses to the United States. And there's not a way that those witnesses could have been compelled to give, for example, out of jurisdiction deposition testimony that could have been trial testimony without the individuals having to come to the United States. That would not be either available or consistent with Mr. Muhammad's confrontation rights. I don't think those witnesses could have been compelled to come to the United States. But they were certainly willing to talk to appellate counsel and freely give the information that's set out in the Desai declaration with respect to Jawed and Mr. Muhammad. There's nothing in the record showing any efforts to actually get signed declarations from them, is there? For example, Mr. Rezwan or anyone else? No, Your Honor. We did request from this court, CJA funds, to hire an investigator in Afghanistan to physically track these witnesses down. That request was not denied. So we contacted them instead telephonically and submitted the Desai declaration. I guess what we're getting at is this case was remanded for a hearing on this claim. And wasn't that the point at which affidavits, declarations, and some statement about willingness to appear and testify? As you know, a lot of witnesses will tell you things, but they're not going to come to court and say it under oath. Wouldn't that have been the time to have presented all of this evidence so the district court could have assessed the impact of this alleged deficiency? I think that if... In other words, we're sort of presented with the notion that if counsel had wandered around and made some phone calls, he might have come up with somebody who was willing to testify that the government's key witness had a vendetta against your client and basically would do anything to harm him. And therefore, had the jury heard that type of testimony, it would have seriously affected the credibility of the government's witness, notwithstanding the recorded tape recording. I think that summarizes it. I think that had counsel presented that situation... So why should we accept these sort of hypothetical proffers at this stage when we remanded it for all of this to be fleshed out in the district court? I mean, I think what's set forth in the Decide Declaration is the substance of the testimony that could have been elicited from these witnesses had trial counsel contacted them and undertaken, requested actually from the district court, dispensation and funds to procure declarations from those individuals. We didn't have those funds and trial counsel never uncovered it because he didn't pick up the telephone and attempt to uncover it. I think the prejudice here, to get back to Your Honor's original question, is that there was no alternative narrative presented to the jury other than the government's theory. And the narrative that Mr. Venegas could have presented to the jury is that the person who introduced Mr. Mohammed into what ultimately became a sting operation against him, and the only person who testified about the alleged Taliban connection, had, as Your Honor mentioned, this deep-seated bias against him. And that would undermine the... What do we do about the fact that there are actually videotapes... Let's just take the drug count to begin with. There are videotapes of him making these drug exchanges, doing these sales, and he's on the tape talking about exactly what he's doing. There's plenty of powder. I can get you all you want. So even if you erase Joey's testimony out of the transcript, then you've got him on tape doing the drug sales. So it's not prejudicial? Your Honor, the tapes prove that Khan Mohammed was a drug dealer. But to convict him of these particular offenses, the jury had to glean very specific things from those audio tapes. In particular, it had to glean that Mr. Mohammed knew or intended that the drugs were to be unlawfully imported into the United States. Right. And I got him on the record saying the jihad would be formed since they send it to America, JA120. So they've got that. I think that's there in his own words. So how would we find... I'm just talking about the drug count. Put aside the narco-terrorism count. Those references, including the one that Your Honor just mentioned, are effectively planted there by Joweed. At the end of the day, as Your Honor mentioned, Mr. Mohammed is attempting to consummate this drug deal. And so he was unwilling to contradict or offend Joweed and was going along with whatever notions it was that Joweed planted there. And the jury was... But Mr. Nesbitt, there's two different challenges to Joweed, to Joweed's... What Joweed says. And I took you to be making one slightly narrower than what you're implying now. One is, Joweed is on tape in a conversation with Mohammed. And Joweed says certain things and Mohammed responds. And separately, what I took you to be objecting to was Joweed in court is asked to interpret the conversation that the two of them had. Now, isn't it fair game to look at what Joweed and Mohammed together say on the tape and allow the jury to infer that when Joweed says something about the Americans and Mohammed concurs, that that's unaffected by what trial counsel may or may not have done in cross-examining Joweed at trial? I think that is affected by trial counsel's failure to elicit the true story behind Joweed and Mr. Mohammed. So if he had done that, he could have presented to the jury a rationale to explain why it was that Joweed was attempting to elicit this information from him, which would have led the jury, there's a reasonable chance it could have led the jury to disbelieve Joweed's testimony. And the fact that Mr. Mohammed says the magic word on tape is not dispositive in no small part because in Afghan culture, it's a very common feature to shift alliances as the circumstances dictate. That's a DE agent named Jeff Higgins testified at trial and he also testified at a suppression hearing in late April. And he made that point in the context of why Mr. Mohammed was not so willing to talk to authorities after his arrest. So I submit that that's what he was doing in these conversations with Joweed. As much drugs as you need, you're going to send them to America? Sure. Just as long as I get my commission. He didn't care. His motivation was to get his commission. That's also demonstrated by the fact that he consummated the first drug deal, the opium deal, in September without having any mention of America prior to that deal. He had no idea where the drugs were going. He did that for the commission. And there's no indication that his motivation changed. There is an indication that Joweed started saying the magic word, America, and Mr. Mohammed went along with it because that's a common feature of the culture in Afghanistan and because he wanted to get his commission. Well, it may be a common feature, but it also means that he knew these things were going to America. Jihad would be formed. This was his words. Jihad would be performed since they sent it to America. He's not just saying, yeah, yeah, whatever. I think there's a reasonable chance if Mr. Venegas had presented the information I just articulated to the jury that they would have found that Mr. Mohammed was reckless with respect to his mental state as to his knowledge of where the drugs were going. But Mr. Venegas never made that argument, never presented that information to the jury because he wasn't equipped with that information because he didn't do the investigation. Well, it's a knowing or reasonable cause to believe standard. So reasonable recklessness would get him too. Mr. Venegas could have pressed that and really presented the argument that the mens rea element was not met, and he was not able to do that. So were this court to agree with your position, how would we describe the errors by the district court on remand? The district court erred in two principal ways and a variety of subsidiary ways that really flowed from those. The district court held that there were only four witnesses available to Mr. Venegas, principally on the basis that Mr. Mohammed, in a colloquy with the judge, mentioned four witnesses on the record, and that was in early May. That's wrong for a couple of reasons. It's wrong because... Can you just catalog for us what you think are the errors, and then we can probe on the ones that we... Because you briefed that fully, and I think it would be helpful to us if you would step through, as Judge Rogers has requested, precisely which things you say are errors. Sure. The two key errors were the holding that there were only four witnesses available, and that Mr. Venegas could not have contacted them except by physically going to Afghanistan. And from those two key factual errors flowed a variety of other errors. The district court focused its entire analysis on what those four individuals... What information those four individuals could have provided. And that was error, because the appellate counsel was readily able to contact 28 witnesses by using the telephone. And where Mr. Mohammed was from, this village, was an extremely small place, such that one person... Everybody knows everybody. And so it's the type of situation where the phone can be literally passed around the village, and it's pretty easy to communicate with multiple people in a short amount of time, the person you represent. Who are these witnesses? He names four, and that's what the district court focuses on. Why is that clear error? It's clear error because it completely ignores the three pages of names and telephone numbers that Mr. Venegas... But the client, the defendant, has identified for the district court the four witnesses who should have been called or contacted according to the defendant. And presumably, he's in the best position to know at the remand hearing, I gather. An additional point is that Judge Catelli did not purport to exhaust Mr. Mohammed's recollection and apology that she had with him on May 2nd. That's in the small supplemental sealed portion of the record. I thought those four were the ones he thought should be talked to with respect to whether he was part of the Taliban, because that's what the conversation wasn't about. He never said those are the only four witnesses to be talked about for my defense. It was just those are the four you can contact to say that I was never part of the Taliban, because that's what was going on at that May 2nd hearing. Is the government going to introduce evidence you're part of the Taliban? I think that kind of makes the point, which is the district court... He didn't say that's all the witnesses that I could use for my entire defense. He was saying these are the four that can refute this specific prop for the government's now making that I'm part of the Taliban. That's right, Your Honor. And the district court focused on those four witnesses as though they were the only witnesses for any purpose that Mr. Venegas could have contacted, ignoring the three pages of discovery. Now, when you're talking about what the district court did hear, one thing the district court focused on, and I just don't know how this works, when you're talking about a failure to investigate, the district court said, look, the attorney here had reasonable strategic decisions for not wanting to put people on as character evidence, or as didn't think this would be admissible, the things about he's a thief would be admissible, and so had reasons that the proffered evidence, the proffered information would never be admissible as evidence in a trial. Is that a proper way to analyze a failure to investigate? Is it only harmful if the investigation would have turned up admissible evidence? No, Your Honor. That reasoning that Mr. Venegas sets forth in his affidavit is corrupt reasoning. It starts with the theory and then finishes with the facts. The reasoning is backwards in the sense that he didn't know what the facts were, so he wasn't equipped to come up with his theories. He thought, well, there's only two categories of information that I might elicit from witnesses. Neither one of those will be useful to me for reasons that I now can divine. Therefore, I don't need to investigate. No, his testimony was, he was concerned that if he called character witnesses, they would be demolished on cross-examination because of the tapes. Yeah. He focused on, first, there were no fact witnesses available, so he didn't think about fact witnesses. He focused on character evidence, and character evidence only with respect to Mr. Muhammad's propensity for truthfulness. That's out because Mr. Muhammad is not testifying. Then he focused on character evidence with respect to Mr. Muhammad's propensity for peacefulness. That's out for the reason that Your Honor articulated. So is it your argument, and I'll ask the government this, too, that following up on Judge Millett's question, that if the district court erred in her legal analysis, that it would be a violation of the first prong of Strickland, that she necessarily, as a matter of law, could not conclude that the result of the trial would have been different, and therefore there was no Sixth Amendment violation? If the district court was wrong about prong one, then there could have been, what was I thought the district court was doing, and I may be wrong, and the district court may be wrong, we remanded this for this to be fleshed out for a lot of the reasons we're asking now. And the district court, having heard what was presented during the remand, decided, based on what I've heard and what's been presented to me, even if there had been this investigation, and counsel himself said he should have done certain things, it wouldn't have made any difference to the outcome of the trial. Yeah. I think the court, the district court was wrong with respect to prong one, but also with respect to prong two, and principally because it focused on those four witnesses that we were just discussing. All right. Why don't we hear from the government? Thank you, Your Honor. And we'll give you a couple of minutes on rebuttal. Thank you. Good morning. May it please the Court, V.J. Shanker for the United States. Your Honors, if I may, I'd like to start with prejudice and jump in right where the Court was with my colleague. My colleague spoke about a reasonable chance that the jury might think X or Y about Joweed, but not to parse language, the test is whether there's a reasonable probability that the outcome of the proceedings would have been different. So whatever the jury might have thought about Joweed, as the Court recognized, they were confronted with 11 audio and videotapes in which Mr. Muhammad directly incriminated himself in both of these offenses. Well, we're talking here about a pretty simple trial. There's a little throat-clearing evidence, but mainly it's the videotapes and Joweed. And they are intertwined. They're coming at the same time. Joweed's interpreting them, giving context for them, talking about it. Here's what it meant. Here's what it meant when we used that word. So they are intertwined. And there was, crediting the Muhammad's theory at this point, evidence that would have blown Joweed's credibility to smithereens, would have blown it up. How is that not such a substantial hole being blown in the government's case that we have to think it could have had, not more likely than not, but just a reasonable probability of affecting one juror's reasonable doubt? Your Honor, I'm not poking at this word, but I do think we have to be clear on the word interpret. These tapes were interpreted by a court-appointed interpreter, translated. They were transcribed. The jury had them in front of them. So these were Muhammad's own words, and there's no dispute that this is what he said. So Joweed was not on the stand actually translating. Well, he was saying what we meant by the red castle. So yes, the interpreter translated red to mean red, and castle to mean castle. But that doesn't mean anything to the jury. Right, but there's nothing... And so on that key stuff, what do we mean by the powder, what do we mean, you know, that meant missiles. That meant the car. That's the, that was the real stuff that, so I'm using translated in the different words here, that communicated, conveyed, explained to the jury what those words meant in terms of violating the law. Right. Your Honor, Mr. Joweed's testimony certainly could have been helpful to the jury under the standards required by Rule 701. That doesn't mean that if you erase, and as I think Your Honor put it yourself, if you erase that testimony from this trial, that the jury, following its instructions, as we have to assume it would have, would not have essentially been required to convict Mr. Muhammad for all of the elements of both of these offenses based on his own words. He used the words, kill Americans. He used the words, we will send the drugs to America. He used the words, infidel, infidels and jihad. We will kill Americans wherever they will be stationed. So again, my colleagues focused on the red castle in Daghosar as being this pivotal piece of, of interpretation by Joweed at the trial. That's just simply inaccurate. Mr. Muhammad said, we will kill the Americans wherever they are. That alone is enough to convict him under 960A. I'm not sure it is, but. Can you outline for us the elements and the best evidence that you have for each element? Let me ask you as a threshold question. I take it your position is that even assuming that counsel erred objectively and failed to provide effective assistance, it's not an impact, it is an ineffective assistance. So set aside all the issues about who was called, who wasn't called, Joweed's credibility. And so I guess I'd like you to just outline for us your best case on that. Which elements, what's the evidence that shows out of Muhammad's mouth that each of those elements has been. Absolutely, Your Honor. If we start with 21 U.S.C. 959, this is the importation count. The first element is manufacture or distribute a controlled substance. All that the jury had to see for that element were the videotapes, exhibits 2G and 2K, and those are Joint Appendix 99 and 123. Those are videos of Mr. Muhammad actually delivering, distributing opium and heroin directly to Joweed and transferring the money to the seller. The second element of 959 is intending or knowing that it will be unlawfully imported into the United States. Mr. Joweed said he is sending the powder to the United States and France, mostly to American cities, and then says the opium is going abroad. And Muhammad says, good, may God turn. Wait, opium going abroad doesn't help you, right? Well, he said to American cities. What page of the J.A. are you reading from? That is 113. And Mr. Muhammad says, good, may God turn all the infidels to dead horses. That's J.A. 114. Subsequently, Mr. Muhammad, not responding necessarily to Joweed, but out of his own mouth, says, whether it is by opium or by shooting, eliminating them is our common goal. I'm sorry. Yeah, but I don't see that stuff on 113. I'm sorry. I can grab my appendix from the desk. This might be all my fault. See, it's Joweed that said on 114, this opium is illegal. Opium is going abroad. Right. Your Honor, I hope I was clear. I was saying that... No, but we want it coming out of... For this argument, I thought we were going to talk about what was coming out of Muhammad's mouth himself. Right. And I can provide that, Your Honor, although I will note that when a jury is hearing a conversation between two people and one person says X and the responding person says I agree or I know, I don't think we have to assume that the jury is not understanding the nature of the conversation and the assent by the party who listened to the words and said I agree. Unless they think that... Right, but our point is that if they think the person who's saying all the things that sets the stage here is a pathological liar out to... But we don't have to. I mean, it's almost like a hearsay analysis, Your Honor. We don't have to believe that Joweed really wants these drugs to go to America. We just have to believe that he said that and Muhammad said I agree I want them to go to America. All right. If you can show me the I agree. Well, that's sure. That's on page 113. He says God willing, as much as he needs, we will get it for him. And then on page 116... Wait, so God willing, we'll get as much as he needs, we'll get it for him. Okay. That's not him saying anything about where it's going. Okay. Page 116 of the Joint Appendix. Line 36. And this is Mr. Muhammad himself. May God eliminate them. We will eliminate them too, whether it is by opium or shooting. This is our common goal. Sure. That could be what I'm going to do to folks in Afghanistan. He's not going to the U.S. to shoot them. Your Honor, if we look at each individual statement in isolation, we can pick it apart in that way. It's not a natural reading of these transcripts. If you look at the surrounding words from both parties, they are clearly talking about Americans. They are clearly talking about sending drugs to American cities. I don't think the jury can be expected to look at each of these little snippets in isolation without hearing the entire conversation. Well, I think you had started with the position that the jury would have to, would virtually have to convict, was I think your statement on this record. And the question is, as I said before, if we assume that Jawid is completely destroyed in his credibility and the jury knows he's out for revenge. And my understanding here is he, as Mr. Muhammad had, was at least at the sentencing stage arguing a trapment. So we ask ourselves, what would have been the impact on the defense? How the defense would have argued this case? And how the jury would have understood it? And so I think it's a little bit, I think it's a little bit hard. I get your point. If we have Muhammad saying the stuff directly out of his mouth, like the one quote that I had. Well, I do have more, Your Honor. I mean, I can point the court to J.A. 120. Yes, to J.A. 120. Jihad will be performed since they send it to America. That's his own words. So that's 959 to complete my answer to Judge Pillard's question. If we turn to 960A. 959. Section, I'm sorry. I'm sorry, I'm talking about the statute. 21 U.S.C. 959. Now if we turn to 21 U.S.C. 960A, the first element is, again, engage in conduct punishable under 841, which is the drug statute. Again, we can look directly at the videos 2G and 2K. While knowing or intending to provide anything directly or indirectly of pecuniary value. Again, I can point to direct specific pages, but Mr. Muhammad repeatedly talks about getting his commission. That's providing something of pecuniary value. To a person or organization that has engaged or engages in terrorist activity or terrorism. He talks about committing jihad. We can place and explode bombs and fire missiles toward the airport. These are all his own words, not Joe Weed's words. This will be our jihad. What they do is kill the Americans. The Americans are infidels and jihad is allowed against them. Wherever they are stationed, we will fire at their base. God willing, we will take this place back from them. These are infidels and we have to eliminate them. I have two questions about that. One is, for purposes of the statute, is it terrorism that occurs anywhere in the world or does it have to be terrorism in the U.S.? It's anywhere in the world. It's terrorist activity for terrorism. The statute defines both by cross-references to other statutes. We can focus on terrorist activity. I think it's the easier one here and either one is sufficient. Terrorist activity is defined in Section 1182, Title 8. It means any activity which is unlawful under the laws of the place where it is committed or in the United States. And it involves an explosive, firearm, or other weapon with intent to endanger directly or indirectly the safety of one or more individuals or to cause substantial damage to property. Do those individuals include military combatants or do they have to be civilians? No, it says one or more individuals. It's a broad statute. This court has called it a broad statute. Other courts have called it a broad statute. I'm not aware... So if somebody is engaged, if two armies are engaged in a battle and one shoots the other, that's terrorism? Well, it would have to be unlawful, the unlawful use of this. So if it's, I guess, permitted under the laws of war, perhaps it would not be unlawful. I think these are questions about the interpretation of the statute that are not presented here. And the terrorist here that was getting these funds, that was getting funded by this, is Mohammed himself? Well, we presented two theories, either one of which was sufficient for the jury to convict. It was Mohammed himself or the Taliban, which he was providing money to, as he said himself in the transcripts. And when the government agreed, for purposes of having the expedited trial, that it was not going to put on evidence that he was a member of the Taliban, that didn't implicate this? No, Your Honor, because what we agreed to not present was evidence that he had been already involved with the Taliban as a high-ranking official and had a history of involvement with the Taliban. Before all this? Right. Well, we did not agree that we would not present evidence that he provided something of pecuniary value to the Taliban. And so, again, I can continue with the elements of the two statutes, but I think we have satisfied all of them directly through... So the best page sites for your 960A supporting terrorist activity, the factual best page sites are? JA-56. That is, what they do is kill the Americans. The Americans are infidels. Wherever they are stationed, we will fire at them. JA-57. It's really, and I hate to be this broad about it, but it's almost all of Exhibit 2A. I would encourage the Court to read that transcript if that's the only one the Court reads. It basically satisfies all the elements of both statutes. Now, I will turn to, I would like to turn to one point that my colleague made about the most crucial piece of information against Jawid being this vow of revenge that he supposedly made. The claim was that he made this vow of revenge, that I will get you if it takes me 20 years, to Mr. Mohammed, not just under his breath, not to someone else, to Mr. Mohammed. And yet, Mr. Mohammed never raised this with his counsel, never raised this with the Court, and, more importantly, throughout the transcripts, Mr. Mohammed says, you are my friend. I trust you. We are great friends. You are a flower. So, the idea that the jury would have completely disbelieved Mr. Jawid based on this possible line of testimony by a witness who was not secured, not brought to this country, who might say, yes, Your Honor? That actually seems to cut the other way because Mohammed is saying, I trust you, and Jawid is behaving in a way that, unbeknownst to Mohammed, is incriminating him. So, in fact, if the jury is made aware that, you know, and reminded, you know, Mohammed's made an error, obviously, in trusting Jawid. And the point is to show that what appears on the face of it to be a conversation between friends is a conversation between one man trusting another man who's reeling him in for prosecution in the United States. Your Honor, may I answer? Please. Your Honor, the point is that why would the jury believe that Mr. Mohammed was duped into trusting Jawid when the whole point of this proposed testimony was that Jawid told him, I will get you if it takes me 20 years. And then, a short time later, Jawid comes to Mr. Mohammed with this plot, terrorist plot, and Mohammed doesn't say, hold on, we've had a history here, I don't want to do anything with you, I don't like you. No. He says, yes, let's do this. I trust you. You're my friend. You are a flower. I'm not meaning to credit it or not credit it, I'm meaning to understand it, and I think the defense's perspective is that Mohammed was less skeptical of Jawid than he should have been, and that counsel, as Mohammed's advocate, should have brought that out. I understand, but my point is as a question of prejudice,  likely have believed this line of argument. It doesn't have to be likely. It just has to be a reasonable probability, and the Supreme Court has said probability doesn't actually mean more likely than that. It can just be a reasonable prospect of reasonable doubt in one juror's mind. Right, and I certainly think it doesn't rise to the level of reasonable doubt for one juror to think that perhaps Jawid had something against Mr. Mohammed, but Mr. Mohammed still worked with him and said all of these things. What we're going to think is, all right, this guy, we know he's turned state's evidence, we know he's got a vengeance against this guy. Everybody who knows him where he's from says he's a liar, a thief, entirely untrustworthy, and this is what the government brings us.  what the government brings us. This is what the government brings us. That's not what the government brought the jury. The government brought the jury 11 audio and videotapes in which Mr. Mohammed said the words and made the actions himself. So on the tape is the statement that Rahim said, I'll get you if it takes me 20 years? No, no, that's nowhere. That's what this supposed witness would have said. But your brief argues that even if the jury would have had a different view of Jal Weed, had his character and credibility been undermined through testimony then it failed to show reasonable probability. Correct, Your Honor. Can I just add something? These videos and audios were made by the DEA? Are they the ones that put the equipment on Jal Weed when he had these conversations? Yes. My understanding is at least at one point Mr. Mohammed told his attorney that yeah that's my picture but that's not my voice. That's right. But his voice was identified on the tapes by DEH and Jeffrey Higgins through standard testimony about familiarity with his voice. Thank you. Thank you. All right, counsel. Laquan? A couple quick points Your Honor. First, my more experienced colleague has pointed out there's a statute that permits foreign depositions on a showing that a witness is not available for trial. So we could have Mr. Benigas could have collected that evidence had he been aware of it. With respect to prejudice the district court applied the terrorism enhancement which bumped Mr. Muhammad's offense level up to 12 by 12 points in his criminal history category up to a 6 category 6 it did not calculate the guideline range without the terrorism enhancement and if it had done that it would have been 10 to 12 and a half years so if the court is inclined to disagree with me with respect to the drug charge then I think remand for resentencing would be appropriate with respect to the narcoterrorism charge a word about Mr. Muhammad's supposed assent to the words that Jawid was planting for him the jury never heard about well let me say this it's important context is everything here Mr. Muhammad was a drug dealer he was attempting to consummate this drug transaction and Jawid over the course of these tapes was his certainly it's entirely possible and a reasonable jury might have believed had it known that Jawid was concealing his bias over the course of the several months during which he was recording Mr. Muhammad and then later when he was on the stand testifying against him twisting the knife with every one of his interpretations he meant the Taliban when he said our law he meant the Taliban's law he meant the Americans he meant missiles when he said program he meant attack when he said program so that's a narrative the jury was just never presented with and it wasn't presented with that because Mr. Venegas didn't uncover it I see my time has elapsed thank you counsel thank you for your assistance to the court thank you
judges: Rogers, Millett, Pillard